249 S.W.2d 324 (1952)
STATE
v.
ROSE.
No. 41851.
Supreme Court of Missouri, En Banc.
May 12, 1952.
Rehearing Denied June 9, 1952.
*326 Roy Hamlin, Hannibal, for appellant.
J. E. Taylor, Atty. Gen., Lawrence L. Bradley, Asst. Atty. Gen., for respondent.
ELLISON, Presiding Judge.
The appellant, 26 years old, a Navy veteran of the last World War, was convicted by a jury in the circuit court of Ralls county of a forcible rape upon Mrs. George S. Koch, a married woman 35 years old, in violation of Sec. 4393, R.S.1939, Mo.R.S.A., and his punishment assessed at imprisonment in the State penitentiary for 40 years. On this appeal his "self employed" counsel [meaning, as we understand, counsel who voluntarily serve without pay] makes fifteen assignments of error, severally complaining of: (1) improper separation of the jury and contact of members thereof with persons other than the sheriff and his deputies; (2) exclusion of proper evidence tendered in his behalf; (3) admission of improper and prejudicial evidence against him, particularly his written confession; (4) prejudicial remarks and comments by the trial judge on the failure of appellant's counsel to state whether they relied on the defense of insanity or on a plea of not guilty, and on other matters; (5) the verdict, which is claimed to be excessive.
In brief the basic facts introduced by the State were as follows. The alleged rape occurred after dark on the evening of April 10, 1948. The prosecutrix had been waiting in the family automobile at the Burlington railroad station in Hannibal for her husband, who was due on the return trip of his run to St. Louis as a locomotive fireman. She testified that as his train was backing in the appellant entered the rear door of the automobile without invitation, told her she had a gun at her back, punched her with it, and ordered her to drive to a place in the country over 10 miles southwest of Hannibal in Ralls county. There he had forcible sexual intercourse with her to the extent of penetration. She told him she was "draining from cancer" and he immediately discontinued the assault, and compelled her to take him back to a point in Hannibal where he jumped out of the automobile and disappeared. Mrs. Koch at once drove home, informed her husband of what had occurred, and they notified the police, she giving a description of her assailant.
Three days later on April 13, appellant was arrested by State Highway patrolman Burnett near Brookfield on State Highway 36 some 90 miles west of Hannibal, while riding on a beer truck. He was armed with a .38 caliber short barreled revolver and holster. When taken back to Hannibal the prosecutrix identified him. The next day, April 14, a special agent of the F.B.I. and local officers took his written statement in which he admitted the rape. Three days thereafter on April 17 the prosecuting attorney of Ralls county filed an information charging him with the rape; the court appointed counsel for him, and he entered a plea of guilty upon which the court sentenced *327 him to life imprisonment in the penitentiary. Forty days later present counsel for appellant filed a motion supported by affidavits to set aside that sentence and judgment on the ground that the appellant was of unsound mind. The motion was sustained but appellant refused to plead, whereupon the trial judge entered a plea of not guilty in his behalf. Appellant took a change of venue from that judge and Judge Hollingsworth of an adjoining circuit was called in to try the case.
At the second trial, beginning December 16, 1948, the appellant testified in his own behalf. In substance he said he arrived in Hannibal about noon on the day of the alleged rape and registered at the Windsor Hotel under an assumed name because he knew the Navy was looking for him as a deserter. Thence he visited an old acquaintance, Mrs. Huff, in west Hannibal. From there he proceeded to a tavern and did some drinking. At the tavern he called a taxi, the driver of which happened to be Bill Wooten, a boyhood friend and former Navy man. He took appellant back to the Windsor Hotel where they had one or two drinks. Appellant said he turned his pistol and holster over to Wooten for the purpose of having the latter obtain money on them for him. Wooten identified them at the trial by general appearance, and said he kept them overnight and returned them to appellant the next day [the alleged rape having occurred during that intervening time.]
Continuing, appellant testified that after Wooten's departure he left his hotel and went to a tavern in north Hannibal and had a few drinks. He was there advised the police were looking for him, and a little later at another place a friend of his told him the Navy was looking for him. At about the same place he saw some men in Navy uniform. Thinking they were seeking him he walked toward the railroad station to catch a train. There he saw the prosecutrix in her automobile. He said they exchanged greetings and he got in the back seat and asked her to take him outside of town so he could escape the Navy men. He had no revolver with him. After demurring a little because of the impending arrival of her husband and lack of gasoline, she drove him out into the country, parked the automobile, and voluntarily submitted to sexual approaches by him, not amounting to penetration because he desisted when he discovered she was bandaged and said she was afflicted with cancer. Then they drove back to the place in Hannibal where he had first got in the automobile, and he left.
Appellant further expressed doubt or ignorance whether the prosecutrix was the same woman as the one involved in the foregoing expedition. And he testified that on the night of April 13, just before he had made his written confession on April 14, he didn't sleep because the police kept bothering him and accusing him of raping a woman with a gun. And they threatened that if he didn't "sign papers" he would get four years, and they would turn him over to the Navy. Other evidence will be detailed in the discussion of the assignments of error in appellant's brief.
The first of these is that the trial jury was permitted to have contact with persons other than the sheriff and his sworn deputies during the trial in violation of Secs. 4071 and 4124, R.S.1939, Mo.R.S.A. The undisputed facts as sworn to by the sheriff were that the trial was held in the middle of December, 1948, at the county seat, New London, but for lack of sufficient sleeping accommodations the jury were quartered each night in the residence of a Mr. and Mrs. Yancey in the city of Perry, some 19 miles away. They were transported thence in three automobiles with a sheriff or deputy in charge of each. On Friday night during the trial a physician, Dr. Brown, was called to the residence to administer a "cold shot" to the sheriff and one of the jury, and either the day before or the next day a "flu shot" was administered to another juror in the evening at the court house by a Dr. Waters.
These treatments consisted of hypodermic injections of vaccine to prevent or arrest a cold. They were brief, and in each instance the sheriff or a deputy was present. The case on trial was not mentioned. Also, on occasion during the trial the *328 jurors were permitted to retire to a rest room in the judge's chambers, while other jurors remained in the hallway, but all were under surveillance of the sheriff or his deputies and the public was excluded. One or more of counsel for the defense unintentionally started during a noon recess to enter the hallway where the jury were, and were requested by the sheriff to retire.
Several decisions of this court are cited by the parties in some[1] of which separation of the jurors and conversation with or between them during the trial concerning the case were held fatally violative of Secs. 4071 and 4124, R.S.1939, Mo.R.S.A.; and in others,[2] not. It is conceded that where such separation is proven, the burden is on the State to establish that the jurors were not subjected to improper influences. But in this case we think the State made a satisfactory showing under the decisions last cited below,[2] and that no prejudicial error appears.
Appellant's second assignment complains of the trial court's refusal to permit his counsel to use in cross-examination of the prosecutrix her deposition taken by him a few days earlier, and cites on that point Woelfle v. Conn. Mut. Life Ins. Co., 234 Mo.App. 135, 150(7), 112 S.W.2d 865, 873-874(11-13) and other decisions referred to therein. On direct examination at the trial the prosecutrix had testified she was a nurse or assistant nurse [not a graduate nurse] and had been so employed for about two years. She said she had received nurse's training at Graham Hospital in Keokuk, Iowa, for about 1-1/2 years in 1940 or 1941, or thereabouts. On cross-examination appellant's counsel asked her if she had not done nursing work for about 7 years, which she denied and repeated it had been about 2 years except for the nursing of her own father. Thereupon appellant's counsel offered to prove she had testified in her deposition that she had worked as a nurse for "a number of years." The court sustained the State's objection that the interrogation involved only a collateral matter immaterial to the issues, and overruled the contention of defense counsel that the discrepancies between her testimony and her recently taken deposition tended to impeach her and throw light on her accuracy, recollection and veracity.
We are unable to agree with appellant on this assignment. The subject matter of the prosecutrix' testimony as to how long she had been nursing patients was wholly collateral and immaterial to the issue in this rape case. Why the State elicited her testimony on this point is not clear. But however that may be, the scope and extent of the cross-examination thereon rested almost wholly in the discretion of the trial court. Two recent decisions are in point on this issue. Hungate v. Hudson, 353 Mo. 944, 185 S.W.2d 646; Gildehaus v. Jones, 356 Mo. 8, 13(2), 200 S.W.2d 523, 526(6-8).
Appellant further complains in his third and fifteenth assignments that the trial court unduly restricted the cross-examination of the prosecutrix on the following matters. On direct examination she testified she was 35 years old, and had first married a Mr. Bush in "about 1932", as nearly as she could remember. After "about five years" she obtained a divorce from him. A son was born of that marriage. In 1943 she married her second husband, Koch, with whom she was living at the times here involved.
On cross-examination the prosecutrix was asked the date of the birth of her son by the first marriage and she gave it as November 2, 1934. She repeated that she *329 and her first husband were married in "about 1932" and said she thought it was on November 17. The marriage was performed at Mexico, Missouri. Cross-examining counsel asked her if she and her first husband could have been married in "November, 1934." The court sustained the State's objection on the ground of immateriality. Appellant's counsel then asserted the cross-examination threw light on the prosecutrix' memory and recollection of past events in her life, and her morality, and offered to prove by her that she was married to her first husband, Bush, after the birth of her child, which offer was refused.
We overrule this assignment. The events about which inquiry was made were foreign to the instant rape case and a cross-examination on such unrelated matters to test the witness' memory was subject to the discretion of the court; there was nothing to show her memory was incorrect; and when cross-examining counsel sought to assail her morality by proving that her child was born out of wedlock, he was bound by her answers already given on cross-examination that she had married her first husband in 1932 some two years before the child was born. State v. Bagby, 338 Mo. 951, 964(4), 93 S.W.2d 241; State v. Wilkins, Mo.Sup.Div. 2, 100 S.W.2d 889, 894(11). See also Gildehaus v. Jones, supra, 356 Mo. loc. cit. 13(2), 200 S.W.2d loc. cit. 526(7).
Appellant's fourth assignment in his brief predicates error on the admission in evidence of appellant's written statement or confession made to an F.B.I. agent and officers of the Hannibal police on April 14, four days after the alleged rape. Three reasons are assigned: (1) that appellant was mentally incompetent to make it; (2) that it was involuntary and obtained by treachery, coercion, threats and promises while appellant was in irons and under continual harassment, and was prevented from sleeping for many hours; (3) and only a part of the whole confession was introduced.
But these charges go far beyond the 9th ground in appellant's motion for new trial, dealing with the confession. In 4-½ typewritten lines it alleged as follows: "Because the court erred in admitting an alleged and purported confession in evidence, to-wit, State's Exhibit B and B1, under the facts and circumstances shown in evidence, and ruling of said court on said matter was highly prejudicial to the rights of the defendant in said case."
This assignment in the motion was wholly insufficient to comply with the statute. Ever since the enactment of Laws Mo. 1925, p. 194, our present statute Sec. 4125, R.S.1939, Mo.R.S.A., has provided that the motion for new trial in a criminal case "must set forth in detail and with particularity, in separate numbered paragraphs, the specific grounds or causes therefor." But as shown above, the motion in this case merely complained generally of the admission of appellant's confession "under the facts and circumstances shown in evidence." Obviously this did not meet the requirements of the statute and merely referred to the whole body of evidence introduced.
Appellant's fifth and sixth assignments complain of error in the admission of the testimony of the State Highway patrolman that when he arrested the appellant three days after the alleged rape, the latter had a .38 caliber short barreled revolver on his person. As a basis for these assignments appellant contends there was no showing that the revolver, or even one like it, was used in the commission of the alleged rape; and that the prosecutrix admitted on cross-examination she had not seen a gun or holster at any time on the night of the alleged crime.
It is true the prosecutrix stated on direct examination, and admitted on cross-examination, that as long as the automobile was moving on the trip to the scene of the rape with appellant in the back seat and his pistol against her back, she did not see it. And the same was true on the return trip to Hannibal. But she further testified on direct and cross-examination that when they arrived at the scene of the rape and appellant got out on the ground he had the pistol, and when he opened the car front *330 door he had the pistol in his hand. The same was true when he pulled her out of the automobile and into the back seat; and likewise after he had accomplished the alleged rape and stood on the ground, at which time he put the pistol in his pocketas she remembered.
There can be no doubt, under the prosecutrix' testimony, that the abduction and rape were accomplished with a pistol, but it is also true the prosecutrix did not describe it. However, the appellant in his oral and written confession admitted the revolver taken from him by the patrolman on his arrest was the one used in the rape, and his description of it fit the weapon identified by the patrolman when it was offered in evidence. The taxicab driver also generally identified the same revolver, but he and the appellant both testified that he [the cab driver] had possession of the weapon on the evening and night of April 13 when the alleged rape occurred. Whether this last was true or not was a question for the jury. There is no merit in these two assignments. For these reasons State v. Krebs, 341 Mo. 58, 61(3), 106 S.W.2d 428, 429(4), cited by appellant, is not in point because of the difference in its facts.
Appellant's seventh assignment is that the trial court erred in refusing to sustain his motion in the nature of a demurrer to the evidence at the close of the whole case. This assignment goes to the 12th, 13th and 14th points in the motion for new trial. The general tenor of the assignment is that the prosecutrix' story is incredible and "contrary to the common experience of womanhood" [citing State v. Burton, 355 Mo. 467, 468, 196 S.W.2d 621], notwithstanding she acted under the coercion of a revolver at her back. His counsel argue she never would have driven through the public streets of Hannibal and encountered the heavy pedestrian and vehicular traffic on both the going and return trips without stopping or making an outcry. We are unwilling to say as a matter of law that a nonconsenting woman would not have done as she did.
Appellant's version is far more fantastic. He said he, a total stranger, drunk and unarmed, accosted the prosecutrix at the railroad station when she was waiting for her husband, whose train was due to arrive; that he told her he was a fugitive from some "Navy men", and asked her to drive him outside of town so he could escape them; and that after demurring a little, because of the impending arrival of her husband's train and lack of gasoline, she voluntarily left her husband in the lurch and went on a round trip of nearly 21 miles into the country and there voluntarily submitted to sexual intercourse with him on the side of a public road although her private parts were bandaged because of a cancer. We think the facts made a case for the jury.
Appellant's eighth assignment complains of the exclusion of the testimony of four women who were intimate acquaintances in his youth. He proved by one of them that as a boy he was in poor health and of a timid disposition, and that they had visited him at the jail on April 17, ten days after the alleged rape. Then counsel sought to elicit from the witnesses testimony that they found him suffering pains in the neck, back and head; and that he was highly nervous, shaking, didn't seem to know or understand them, didn't talk coherently and was in a state of shock.
The court excluded the testimony because: (1) it was too remote, since the conditions described were attributed largely to drunkenness for two or three days before the confession was signed, and would not have continued to exist after appellant had sobered up in jail for four days after it was signed; (2) that part of the proferred testimony, such as pains in the neck, back and head, was not objective and such as the witnesses could observe, but was defendant on appellant's hearsay statements; (3) and that appellant's counsel refused to state whether they relied on insanity as a defense to the crime, on which they would have had the burden of proof. Appellant's counsel then made a proffer of the rejected testimony in the record.
In that connection counsel stated they would follow the proffered testimony with other proof that appellant was irrational *331 when he signed his confession on April 14 because of sleeplessness through the preceding night, due to harassment by the officers and excessive drinking for several days causing a "black out", mental incompetence and loss of reason. And later they did offer to prove by him that in the Navy he was engaged in certain battles, became shell-shocked, and was hospitalized. This testimony, also, was excluded by the court because of counsel's refusal to plead insanity as a defense to the crime, notwithstanding the testimony of his medical experts had then already been introduced. But the appellant did testify before the jury that the police kept him awake all night immediately preceding the taking of his original confession; and that they threatened to turn him over to the Navy as a deserter, where he would get four years imprisonment if he did not sign the confession. This was denied by the F.B.I. agent, Duffy, who took the confession. He said appellant was advised of his rights and stated he made it voluntarily.
Likewise, the defense produced three expert witnesses, Dr. John J. Reichman, Dr. Ralph Hank and Rev. Ingerslew, a minister and psychologist. Dr. Reichman testified he examined appellant on April 30 and thought he was insane then, and even more so on April 10 and 14, the dates of the crime and confession, because he believed appellant had always been a constitutional psychophatic; had a war psychosis; was a chronic alcoholic; and had been drinking heavily before his arrest and confinement. The testimony of Rev. Ingerslew was excluded because the court ruled he had not qualified as an expert. Dr. Hanks, a conceded expert, had examined appellant over seven months after the crime and confession, and found him then oriented as to time, place and person. In rebuttal Sheriff Ruoff of Marion county, Sheriff Rosser of Ralls county, and James Duffy, special agent of the F.B.I. all or some of whom had been in contact with appellant from about the time of his arrest and confession, and on April 17 when the four female witnesses had visited appellantall of these witnesses testified that in their opinion appellant was sane.
In their brief here appellant's counsel assert there is a distinction between the test of a defendant's mental capacity to make a confession to crime and his mental capacity to commit the crime itself. The former, they say, is the same as in the execution of a will or contract, whereas in the latter the accused must have been unable to distinguish between right and wrong, citing 22 C.J.S., Criminal Law, § 828, p. 1451; 16 C.J. §§ 1498, 1499.
But that was not the view taken by appellant's counsel during the trial. On the contrary they stated several times that the testimony of the four female witnesses was offered "primarily" for the purpose of proving appellant's mental capacity to make his written confession, but they added that if it was admissible for that purpose it would be competent for all purposesthat is to establish the defense of insanity. In fact one of appellant's counsel stated when the first of the four witnesses was testifying, that the issue "at this time" was on appellant's "sanity" when he signed the confession. In other words, they were then contending that appellant's mental capacity to make the confession and to commit the crime were to be measured by the same yard stick.
And that is the doctrine stated in 22 C.J.S., Criminal Law, § 828, p. 1451, which they cite. It says: "A confession is not ordinarily inadmissible on the ground of accused's alleged insanity where his sanity is a primary issue in the case. Furthermore, the burden of proof is on accused pleading insanity to prove his legal incapacity to confess the crime." (Italics ours.) And such, apparently, is the doctrine of State v. Campbell, 301 Mo. 618, 623(3), 257 S.W. 131, 133(5), also cited by appellant, where it is said "A confession of an insane person would be no confession at all." In other words, if there be an issue on the sanity of an accused, then an issue on a confession he has made must be measured by the same yard stick. And it is further stated in some authorities "that intoxication, less than mania, does not exclude a confession made during its continuance." 22 C.J.S., Criminal Law, supra, § 828, p. 1452;
*332 74 A.L.R. p. 1102, note; McAffee v. U. S., 72 App.D.C. 60, 111 F.2d 199, 204(3).
It is, of course, clear that confessions of an accused may be excluded on other grounds than insanity, such as coercion, fraudulent promises and the like. And it is also true that a lay witness may express an opinion on the insanity of an accused if he states the facts upon which it is based, State v. Todd, 342 Mo. 601, 607(6), 116 S.W.2d 113, 117(11, 12). But here the offer of proof did not say appellant was insane. Aside from his pains it merely was that he was highly nervous, shaking, didn't seem to know or understand the women who visited him, didn't talk coherently, and was in a state of shock. We rule this assignment against appellant.
Appellant's ninth assignment is that the trial court erred in refusing to permit Rev. Ingerslew to testify as an expert on appellant's insanity. He had visited appellant in jail once and there conversed with him for about two hours, some six weeks after the alleged rape. The trial court ruled he had not qualified as an expert, whereupon appellant's counsel proffered in evidence his factual observations, and his opinion that appellant was suffering from some type of war psychosis; was socially maladjusted; and was mentally unbalanced. Regarding his qualifications, the witness had previously stated that he was a Methodist minister 59 years old; that he had studied for the ministry in designated reputable universities here and abroad; had also studied construction engineering; taken post graduate work in philosophy and especially psychology; done war relief work abroad; been a psychological consultant to the judge of a criminal court in Baltimore; and also to the medical staff of Ft. Henry, a Government hospital for plastic surgery.
The rule stated in both 23 C.J.S., Criminal Law, § 867(b), p. 81-82, and 16 C.J. § 1541, p. 753, is that "while a witness must be a physician in order to qualify as an expert on insanity" (italics ours), yet ordinarily he need not be a specialist though some courts hold to the contrary on that point. Similarly 20 Am.Jur., § 785, p. 659, agrees that: "According to the general rule a physician is competent to testify as an expert although he is not a specialist * * *." (Italics ours.) Later the same volume, § 851, p. 713, declares: "As a general rule, only persons of scientific training and medical men are regarded as experts who may express opinions as such upon issues of sanity or insanity." (Italics ours.) It cites a Texas case[3] where a clergyman "who had read works on moral and intellectual science, but none on insanity" was held not qualified as an expert; and a California case[4] decided in 1880, holding a Catholic priest whose preparatory education and daily observation of his communicants had equipped him to pass on their mental condition, was qualified as an expert on insanity in a civil will contest.
But in a later criminal case[5] the same court held a medical student with 3000 hours experience in observing insane persons in a receiving hospital was not qualified as an expert on insanity after a brief observation of the defendant. And a more recent Minnesota civil case[6] held a psychologist, who was not a graduate physician and did not claim to be a specialist on questions of insanity, was competent to testify on the intelligence quotient of persons for "feeble mindedness" requiring confinement in a state school.
The authorities generally agree that it would be impracticable to set any absolute standard as to the qualifications of an expert witness; and that of necessity the question must rest largely in the sound discretion of the trial court. 23 C.J.S., Criminal Law, § 867(b), p. 82. In fact it is said in 20 Am.Jur., § 851, p. 713, that on the question whether an expert witness is competent to testify on the issue of sanity or insanity, the decision of the trial *333 court is final and will not be reviewed except in extreme cases where a serious mistake had been made. We are not justified in overturning the ruling of the trial court who saw and heard the witness.
Appellant's tenth assignment is that the trial court erred in refusing him the right to testify to matters pertaining to his past life: respecting the class of Navy service he had rendered in the last World War; the duration thereof; the battles in which he had engaged; and the character of head, brain and back injuries he had received in those engagements. He asserts the exclusion of that testimony was erroneous because: (1) the State was allowed to prove he was a deserter from the Navy; (2) and the evidence would have had a bearing on his mental capacity to make the written confession offered in evidence.
We think there is no merit in the assignment. The first reference to appellant's being a deserter from the Navy was made in the testimony of State's witness F.B.I. agent Duffy. He stated that was the reason he and the Hannibal police were looking for appellant. Duffy took three written confessions from appellant: one covering the instant rape; another, the desertion; and a third some other undesignated offense. Appellant's counsel made no objection to the testimony that he was a deserter, but only on the ground that the confession was involuntary, and that all three confessions should be introduced as one "total statement." In cross-examination he then asked agent Duffy whether appellant had told him he had enlisted in the Navy in December, 1941, and engaged in many battles in the South Pacific. Duffy denied it. Counsel then elicited the fact that Duffy had not inserted in the rape confession anything about appellant's desertion from the Navy, his military training, or his being wounded in the battle of Guadalcanal in 1943.
On redirect examination of appellant his counsel sought to prove appellant had joined the Navy in 1941 and served several years; that he worked in the hold of a ship near the boiler room; and that he had participated in a number of battles including Guadalcanal, as a result of all of which he became shell shocked and otherwise incapacitated, and in consequence was hospitalized in San Diego, where he "walked away." Counsel asserted these facts went to his "identification" and "background" before a jury in a county not his home. The court refused to admit the testimony unless appellant invoked the affirmative defense of insanity, and counsel refused to do it, claiming the right to make that defense under a plea of not guilty. The court excluded the proffered testimony. And presently counsel on direct examination elicited from appellant, himself, the fact that he told the prosecutrix that "the Navy was looking for me." We think the trial court ruled correctly on this assignment.
The eleventh assignment is that the court erred in continually demanding in the presence of the jury that appellant's counsel state whether the appellant's defense was insanity, even after counsel had stated that the plea was not guilty, and asked to be allowed all the rights a defendant would have under the latter pleawhich would have put the burden on the State to prove appellant guilty beyond a reasonable doubt. There is no merit in this assignment. Appellant's able counsel must have known that insanity is an affirmative defense under the law of this State. Yet they persisted in attempting to introduce evidence directed to that issue without claiming that defense, on the ground that it was applicable to appellant's confession. This continued over 264 pages of a 312-page bill of exceptions [so far as the evidence alone is concerned], when they asserted they were not compelled to declare in advance what appellant's defense would be. And even then they did not state that they were relying on insanity as a defense.
However, the court in the State's instruction No. 7 told the jury if they found he signed the confession because he was unable mentally to know and understand what he was saying or writing, or signing, and the import thereof, then they were instructed to disregard such alleged confession, *334 statement or statements as evidence of the guilt of the defendant in the case.
The twelfth assignment is that the trial court erred in making prejudicial statements at and toward appellant and his counsel, over the latter's repeated objections and motions for mistrial and to discharge the jury. The statements specified are that the court would say "Lets go to something else," and "The court has ruled on that, gentlemen, let us proceed." There are some cases in the reports where the trial was intemperate or overbearing, but in our opinion this is not one of them. When the court has ruled on an issue it is the duty of counsel to abide by that ruling, even though they think it was erroneous. We recognize that counsel were earnest and sincere, and that the issue was vital to their client. But our reading of the record does not justify the assignment here made.
The thirteenth assignment complains that the trial court erred in permitting the State's counsel on cross-examination to ask appellant's expert witness, Dr. Reichman, the following question: "Did you ever hear of it [the defense of insanity] being interposed in a case as a sham?" There is nothing to show the court had any advance notice of the question and permitted it to be asked. And appellant's counsel promptly interjected: "We object to that and ask for discharge of the jury, its improper." The court with equal promptness sustained the objection, but overruled the motion to discharge the jury. Appellant's counsel excepted to the latter ruling, and continued: "Its highly improper and we ask for discharge of the jury because of the inflamatory remarks of counsel." The court said: "The court has sustained the objection. The question was improper. The jury will disregard it. The motion is overruled." We think this was sufficient, and overrule the assignment.
The fourteenth assignment asserts that the punishment of forty years imprisonment in the penitentiary was flagrantly excessive under the "flimsy" evidence introduced by the State and betokens passion and prejudice. Under Sec. 4393, R.S. 1939, Mo.R.S.A., it could have been death. The appellant admitted the underlying main facts: that he had been drinking and accosted the prosecutrix at the railroad station; that he, a stranger, got in the back seat of her automobile and after demurring a little she drove him out into the country; that after a short stay there they made preparations for sexual intercourse; and that the found she was bandaged, and she told him it was for cancer.
That far the prosecutrix could not have been perjuring herself when she testified. The main points of difference in their testimony were that she said she made the trip and submitted to sexual intercourse to the extent of penetration under the coercion of a revolver. He testified he did not have a revolver with him; that she went with him and submitted willingly, but that he did not penetrate her when he found she had a cancer. He did have a revolver, both before and after the assault. But he and his friend the taxicab driver testified the latter had the revolver that evening. If the prosecutrix told the truth, then appellant added perjury to his criminality. We hold the punishment was not excessive.
Appellant's fifteenth assignment is that the trial court erred in not permitting his counsel to cross-examine the prosecutrix concerning her previous divorce, and the date of her previous marriage and the birth of her son. This point was covered in the discussion of appellant's third assignment near the beginning of this opinion.
For the reasons stated, the judgment of the trial court is affirmed.
TIPTON, J., dubitante.
LEEDY, J., concurs.
Adopted as the opinion of the court en banc.
HYDE, DALTON, LEEDY and CONKLING, JJ., concur.
TIPTON, J., dissents.
HOLLINGSWORTH, J., not sitting.
NOTES
[1] State v. Hayes, 323 Mo. 578, 583-586(3), 19 S.W.2d 883, 886-887(2-5); State v. Malone, 333 Mo. 594, 603(7), 62 S.W.2d 909, 912-915(6, 7); State v. Schlie, 350 Mo. 924, 926-927(2), 169 S.W.2d 348, 349(2-4).
[2] State v. Shawley, 334 Mo. 352, 379-383(14), 67 S.W.2d 74, 88(29-31); State v. Dodson, 338 Mo. 846, 848(1), 92 S.W.2d 614, 615(1); State v. Maples, Mo.Sup.Div. 2, 96 S.W.2d 26, 27, 30(14); State v. Westmoreland, Mo.Sup.Div. 2, 126 S.W.2d 202, 204(14, 15); State v. Ferguson, 353 Mo. 46, 54(4), 182 S.W.2d 38, 42(12).
[3] Burt v. State, 38 Tex.Cr.R. 397, 40 S.W. 1000, 1003(6), 43 S.W. 344, 39 L.R.A. 305, 326(7), 330.
[4] In re Toomes' Estate, 54 Cal. 509, 515, 35 Am.Rep. 83.
[5] People v. Estes, 188 Cal. 511, 521(9), 206 P. 52, 56(9).
[6] In re Masters, 216 Minn. 553, 13 N.W.2d 487, 158 A.L.R. 1210, 1219, Annotation.